OPINION
{¶ 1} T. W. appeals from the finding of the Greene County Juvenile Court that he committed four acts of delinquency, namely, four counts of rape. T. W., age 15, was charged on February 11, 2008 with raping D. W., a nine-year-old, and Z. R. a seven-year-old between January 1, 2005 and December 9, 2007. *Page 2 
 {¶ 2} The December 9, 2007 incident occurred at Salima R.'s home. Salima was a childhood friend of Dameka. Salima often babysat Dameka's children. On the day in question, Dameka and T.W. were over at Salima's house to do laundry. While the children argued over access to the downstairs television, Salima suggested T.W. use the television in her upstairs bedroom. D.W. went upstairs to her bedroom. While upstairs, T.W. entered D.W.'s bedroom. Once in the bedroom, T.W. picked D.W. up and put her on the bed; he then pulled down his pants as well as D.W.'s pants. T.W. then climbed on top of D.W. and put his penis inside her vagina. D.W. testified that this hurt her. D.W. stated that she yelled in pain and her sister, Z.R. walked into the room and saw T.W. committing the assault on D.W. When Z.R. walked into the bedroom, she saw T.W. on top of her sister, D.W., and she told him to stop. (Contested Hearing Tr. pp. 21-22.) When Z.R. walked in D.W. was only wearing a tee-shirt and T.W.'s pants were down. After Z.R. walked in, T.W. quickly pulled his pants up and went into the bathroom. D.W. pulled her pants up, and together the girls ran outside to tell their mother; when they got to her, they were screaming and hysterical. D.W. specifically stated that she was tired of T.W. "doing this to her."
 {¶ 3} The girls then disclosed prior incidents of sexual assault at the hands of T.W. Because Salima was working full-time and going to school part-time, she and Dameka had a child care arrangement worked out. In the morning, Salima would drop her daughters, D.W. and Z.R. off at T.W.'s house at approximately 6:00 a.m. every Monday through Thursday. Salima would return to pick D.W. and Z.R. up after work and school ended at approximately 10:00 p.m. The girls indicated that other sexual assaults happened in the early morning hours before school while in T.W.'s house. *Page 3 
 {¶ 4} Prior to the kids leaving for school in the morning, T. W. both vaginally and orally raped D.W. in the living room of his family home. After T.W. vaginally raped D.W., she found what she described to be a "grayish" and "kind of gooey" substance in her underwear. This assault occurred while D.W. was in the third grade, which would have been the 2006-2007 school year. After raping D.W., he threatened her into silence stating, "you better not tell or see what happens."
 {¶ 5} Z.R. also disclosed incidents of sexual abuse at the hands of T.W. Z.R. disclosed that T.W. had vaginally raped her multiple times at T.W.'s old house in Fairborn, Greene County, Ohio. Z.R. further disclosed that T.W. orally raped her on one occasion. Z.R. testified that when T.W. put his penis in her mouth, that "gooey" stuff came out of his penis and into her mouth.
 {¶ 6} T.W. testified in his defense that he did not engage in any sexual activity with D.W. or Z.R. T.W. explained that he was wrestling with D.W. when Z.R. observed him lying on top of D.W. in the bedroom. He testified he was five feet, ten inches tall and weighed 185 pounds. He testified he guessed D.W. weighed about forty pounds. He explained his pants were down low because he wears them that way.
 {¶ 7} Mark Landers, an attorney and T.W.'s freshman football coach, testified as a character witness for T.W. Landers testified T.W. was a nice young man who he believed was a truthful person.
 {¶ 8} The State and T.W. stipulated to the contents of physical examinations conducted at the Children's Medical Center Clinic on February 18, 2008. A genital and anal exam of Z.R. revealed no abnormalities. The physician, Dr. Lori Vavul-Roedinger noted that the examination did not confirm nor rule out the possibility of sexual abuse. *Page 4 
The physician made similar findings in regard to D.W.
 {¶ 9} In adjudicating T. W. delinquent, the court found both children truthful. The court noted there was no evidence presented to indicate either child had a motivation to lie or falsely accuse T.W. In addition, the court noted the girls provided graphic details of the incidents, including the presence of what can only be logically inferred to be semen. There was, the court stated, "no evidence that the girls could have knowledge of ejaculation from some source other than the incidents with [T.W.]"
 {¶ 10} In a single assignment, T.W. argues the delinquency findings were against the manifest weight of the evidence. T.W. notes there was no testimony he was left alone in the Clover Street home. T.W. notes that the testimony of Z.R. that T.W. raped her while T.W.'s mother's boyfriend slept nearby on a couch is simply not credible. T.W. notes that D.W. testified that T.W. left a "grayish and kind of gooey" substance in her underwear after he raped her during the third grade, and she told her mother about it. T.W. notes, however, that D.W.'s mother never mentioned this incident even when specifically asked about it by the prosecution. Lastly, he notes that despite D.W.'s testimony that she witnessed T.W. rape Z.R., Z.R. specifically stated no one saw the rape occur.
 {¶ 11} The State argues that T.W.'s assignment should be overruled because the trial judge did not lose his way in crediting D.W. and Z.R.'s testimony over that of T.W.'s.
 {¶ 12} In a manifest weight challenge, the appellate court sits as a "thirteenth juror," weights the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether the jury clearly lost its way and created such a manifest miscarriage of justice as to warrant reversal. Only in exceptional cases where *Page 5 
the evidence weighs heavily against conviction should a verdict be overturned by an appellate court. Generally, the weight to be given to the evidence reviewed and the credibility of the witnesses is primarily for the trier of fact to resolve. State v. Thomas (1982),70 Ohio St.2d 79. When assessing witness credibility in a manifest weight challenge, it has been noted that "the choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." State v. Awan (1986), 22 Ohio St.3d 120.
 {¶ 13} This matter was heard by an experienced juvenile court judge who stated in his findings that he found the young girls truthful, with no apparent motivation to falsely accuse T.W. of these acts of delinquency. The evidence in this matter is certainly not overwhelming. The fact that the children were not examined by a physician for some ten weeks after the last incident was not helpful. The trial judge was in the best position to observe the children as they testified and how they reacted to cross-examination. Their testimony was not internally inconsistent. There is no evidence the trial judge lost his way in determining that T.W. committed these delinquent acts beyond a reasonable doubt. The Appellant's assignment of error is Overruled.
 {¶ 14} The judgment of the trial court is Affirmed.
 DONOVAN, P.J., and GRADY, J., concur. *Page 1